WILLIAM D. BEIL (admitted *pro hac vice*)
JASON M. HANS (admitted *pro hac vice*)
ROUSE HENDRICKS GERMAN MAY PC
1201 Walnut, 20th Floor
Kansas City, Missouri 64106
Telephone: (816) 471-7700
Facsimile:   (816) 471-2221
E-mail: billb@rhgm.com
E-mail: jasonh@rhgm.com

JEFFREY E. FAUCETTE (No. 193066)
SKAGGS FAUCETTE LLP
One Embarcadero Center, Suite 500
San Francisco, California 94111
Telephone: (415) 315-1669
Facsimile:   (415) 433-5994
E-mail: jeff@skaggsfaucette.com

Attorneys for Relator CHRIS MCGOWAN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* CHRIS McGOWAN, an individual, | Case No.: CV-09-5984 (JSW) |
| Plaintiff, | **THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729** |
| v. | **DEMAND FOR JURY TRIAL** |
| KAISER FOUNDATION HEALTH PLAN, INC., a California Corporation, | |
| Defendant. | |

1    Plaintiff UNITED STATES OF AMERICA ("United States"), by and through Relator

2   CHRIS McGOWAN, alleges as follows:

3   **I.    INTRODUCTION**

4    1.    Over the past several years, one of the best-known names in healthcare in

5   California—Kaiser Foundation Health Plan, Inc. (hereinafter "Kaiser") —has taken advantage of

6   the federal Medicare Advantage program to illegally pad its profits.  Kaiser has done so by

7   submitting false data and claims to the federal Government, in violation of the False Claims Act,

8   31 U.S.C. §§ 3729 *et seq.*

9    2.    Spending on healthcare in the United States has spiraled out of control.  Healthcare

10   in the United States is now a $2.2 trillion industry.  Almost half of that spending originates from

11   the Government, most commonly in the form of Medicare or Medicaid payments to providers of

12   healthcare products and services.  Knowing that the Government lacks the ability to track this

13   massive amount of money as it flows through the complex healthcare delivery system,

14   unscrupulous companies see Government money as an easy source for padding their profits.

15   Sadly, Kaiser has become part of this problem through its abuse of the Medicare Advantage

16   program–a program designed to benefit senior citizens, not private insurance companies.

17    3.    Kaiser is subsidizing its commercial business operation on the backs of taxpayers.

18   The Medicare Advantage program has become—by far—Kaiser's most-profitable major line of

19   business.  In the first quarter of 2008 alone, for example, Kaiser made *$359 million in profits on*

20   *its approximately 819,000 Medicare Advantage members, and made only marginally more—$527*

21   *million—on its 6.6 million commercial HMO members.*

22   **II.    OVERVIEW OF THE SCHEME**

23    4.    Under the Medicare Advantage (MA) program, senior citizens who are eligible for

24   Medicare can elect to enroll in a Medicare Advantage program offered by a private health plan

25   that has entered into a contract with the United States to be a Medicare Advantage Organization

26   (MAO), such as Kaiser.  The MAO is paid for each MA plan an annual "capitated" (*i.e.*, per

27   enrollee) amount from the federal Government to provide all of the covered healthcare services the

28   enrollee needs.  This differs from the traditional "fee-for-service" Medicare program, under which

health providers are paid by the government for each service they provide. Since at least 2005, Kaiser has been a MAO pursuant to a contract with the United States, and has offered multiple MA plans including individual/general enrollment plans and employer group waiver plans (EGWPs).

5.     Under Medicare Advantage, the capitated amount the MAO is entitled to is determined on an annual basis, based on data submitted to the government by the MAO for each MA plan. Pursuant to bid instructions promulgated by the Centers for Medicare and Medicaid Services ("CMS"), an operating division of the Department of Health and Human Services ("DHSS"), the MAO submits, for each MA plan, data on its previous-years' per-enrollee costs, its anticipated per-enrollee costs (less anticipated co-pays and premium payments by enrollees) for the bid year, and the profit margin per enrollee. The sum of the anticipated per-enrollee costs and the profit margin submitted in accordance with CMS bid instructions constitutes the MAO's request to the Government for each MA plan. This stated cost figure was referred to as the "Adjusted Community Rate" or "ACR" prior to 2006, and as the MAO's "bid" for the plan thereafter. Unless the stated cost exceeds a "benchmark" set by the Government, the MAO is paid the full stated cost amount, per enrollee in each plan. Additionally, if the "bid" or "revenue requirement" for a particular plan is less than the benchmark, the MAO is paid 75% of the difference between the benchmark and the full stated cost amount. This 75% amount, termed the "rebate," must be used by the MAO to lower premiums paid by enrollees or provide supplemental benefits for the applicable plan.

6.     Under the Medicare Advantage rules applicable to bids for 2008 and 2009, MAOs are not allowed to claim a profit margin for individual/general enrollment MA plans, as measured at either the contract level or a more aggregated level, that is not within a reasonable range (1% or 1.5%) of their other lines of business and MAOs are not allowed to claim a profit margin for any EGWP MA plan that has more than a "small difference (that is, up to 1%)" from the overall margin level for the MAO's general enrollment plans or from the profit margin submitted for the corresponding individual/general enrollment MA plan for the same year.

7.     Despite these regulations, as detailed below, Kaiser's bids for its individual/general

THIRD AMENDED COMPLAINT:                                    CASE NO. CV-09-5984 (JSW)

enrollment MA plans in 2008 and 2009 contained profit margins, as measured at either the contract level or a more aggregated level, that were in excess of 1.5% in addition to the profit margin of Kaiser's other lines of business, and Kaiser's bids for its EGWP MA plans in 2008 and 2009 contained profits margins that were in excess of 1% in addition to the overall margin level for the MAO's general enrollment plans and were in excess of 1% in addition to the profit margin contained in the corresponding individual/general enrollment MA plans.  Kaiser used these falsely certified bids to obtain money from the government.

III.   **PARTIES**

8.   The plaintiff in this action is the UNITED STATES OF AMERICA by and through relator CHRIS McGOWAN.  At all times material to this action, CMS has been an agency within the DHHS and has administered the Medicare Advantage program, which paid benefits from funds provided by the Federal Government.  CMS provided Medicare benefits to qualified recipients, which included payment of claims to Defendant for their provision of benefits to Medicare Advantage members.  These claims were paid based upon Defendant's false representations that the data it provided to CMS in its Medicare Advantage bids were accurate and true and upon Defendant's false representations that the bids submitted complied with CMS bid instructions.

9.   Relator CHRIS McGOWAN is an individual, and was formerly employed by Defendant Kaiser Foundation Health Plan, Inc. as the Managing Director of Fixed Income and Liability Management at Kaiser.  Although Relator was not involved in preparing Medicare Advantage bids while he was employed by Kaiser, internal, non-public information known to Relator serves as the basis for this action.

10.   Defendant KAISER FOUNDATION HEALTH PLAN, INC., ("KAISER") is a California corporation with its principal place of business at One Kaiser Plaza, Oakland, California 94612.  At all times relevant hereto, KAISER conducted business in California, including but not limited to providing healthcare services to the general public in California.

IV.   **JURISDICTION AND VENUE**

11.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.  Venue is proper within this district under the provisions of 28 U.S.C. § 1391(b) and (c).

12.     Venue is proper in the San Francisco or Oakland Divisions of the Northern District of California pursuant to 28 U.S.C. § 1391 and Civil Local Rule 3-2(d).

**V.     THE MEDICARE ADVANTAGE PROGRAM**

13.     The traditional Medicare program pays providers on a fee-for-service basis.  For each service or product provided to a Medicare-qualified senior citizen, the provider sends a bill to Medicare for reimbursement.

14.     Several decades ago, the Government began providing another option:  a senior citizen could sign up with a qualified organization, and the organization, through one or more private health plans offered by the organization, would provide all of the senior citizen's Medicare-qualifying health care needs.  In exchange, Medicare provided the organization with a lump-sum, per patient (*i.e.,* a "capitated" payment).  The popularity of this alternative to the fee-for-service system has waxed and waned over the years, as the Government has adjusted its reimbursement formula.

15.     Most recently, this system—which since 2003 has been called "Medicare Advantage" —has grown in popularity, with Kaiser and other providers, for a very simple reason: though the Government's stated purpose in introducing the bid system in 2006 was to control costs, it has not succeeded in doing so.  Consequently, as of 2008, Medicare payments to Medicare Advantage organizations averaged 113% of the average fee-for-service amount paid by Medicare, per patient, in the same county.

16.     As a result, health plans are able to make more money under the Medicare Advantage capitated program than they are by serving senior citizens under the traditional fee-for-service Medicare program.  With the increased payments, honest health plans are also able to provide more, and better, service to their patients.  Health plans have therefore begun to more-actively promote Medicare Advantage plans, and enrollment rates have increased.  In 2003, only 5.3 million individuals were enrolled in Medicare Advantage plans.  As of July 2008, that number nearly doubled, to 10.1 million.

**VI.     THE MEDICARE ADVANTAGE ACR/BID PROCESS**

17.     Since 2006, the Medicare Advantage program has utilized an annual bidding

THIRD AMENDED COMPLAINT:                                    CASE NO. CV-09-5984 (JSW)

1  process to determine how much a Medicare Advantage organization, such as Kaiser, will receive

2  in funding.  In the bid, the MAO must submit the amount of medical costs, administrative costs,

3  and profit margin it will require to provide benefits to the average Medicare Advantage patient.

4  The medical costs and administrative costs are all based on actual data from the last full calendar

5  year.  The profit margin is developed by the MAO in accordance with CMS bid instructions.

6      18.      The bids are submitted on a standardized spreadsheet template, with multiple

7  worksheets.  On Worksheet One, the health plan submits its base period data on its costs.  The

8  "base period" is a full-year's data from two years prior to the bid year.  For example, the base

9  period for the 2007 bid is January 1, 2005, to December 31, 2005.

10     19.      On Worksheet Two, the template projects the base period data forward to the bid

11  year, using "trend factors" provided by the health plan.

12     20.      On Worksheet Three, the template calculates that amount of cost-sharing (e.g.,

13  patient co-pays) that would apply to the projected base amount.

14     21.      The projected base amount, less the cost-sharing, is reported on Worksheet Four.

15  To this amount, the plan adds its requested administrative costs, and its profit margin.  The total

16  amount is the plan's bid.

17     22.      Prior to 2006, the plans completed a similar spreadsheet, as part of a similar filing,

18  called the "Adjusted Community Rate," or "ACR" filing.

19     23.      The ACR and bid filings were and are submitted on an annual basis.  Pursuant to 42

20  C.F.R. § 504(*l*)(4), the CEO or CFO of the MAO, or an individual delegated with the authority to

21  sign on their behalf, must certify that the filings, and all data submitted in connection with the

22  filing, "are accurate, complete, and truthful."

23     24.      The MAO is also required to have its actuary certify as true aspects of the bids as a

24  prerequisite to submission of the bids to CMS and receiving payment from the United States.  In

25  2008, the MAO's actuary was required to certify that "the entire bid(s) identified in this

26  certification are in compliance with the applicable laws, rules, CY2008 bid instructions, current

27  CMS guidance and also comply with the appropriate Actuarial Standards of Practice."  In 2009,

28  the MAO's actuary was required to certify that "the entire bid(s) identified in this certification are

1  in compliance with the applicable laws, rules, CY2009 bid instructions, current CMS guidance

2  and also comply with the appropriate Actuarial Standards of Practice."

3      25.      A health plan may offer several different Medicare Advantage plans to individuals

4  and groups, with different levels of supplemental benefits.  For each Medicare Advantage plan, the

5  health plan must submit a separate bid (or before 2006, ACR filing).  Kaiser has two separate

6  Medicare Advantage contracts – one in California and one in Hawaii.  Kaiser offers multiple

7  Medicare Advantage plans under those two contracts and therefore submits multiple bids each

8  year.

9      26.      Each MAO, including Kaiser, is required to submit a bid annually for each MA

10  plan that it intends to offer in the following year.  Each MAO, including Kaiser, cannot receive

11  money from the Government without submitting bids that contain a certification of compliance

12  with the CMS bid instructions from the MAO's certifying actuary.

13      27.      The 2008 and 2009 CMS bid instructions require that the profit margin submitted

14  in the bid filings for individual/general enrollment MA plans be within a certain range of the profit

15  margin for the health plan's other lines of business.  Specifically, the instructions state that the

16  plan's "Medicare margin requirement, as measured by percentage of revenue, **is to be within a**

17  **reasonable range (for example, plus or minus 1% or 1.5%) of other lines of business**."  The

18  instructions further state that "[o]verall Medicare margin levels may be determined either at the

19  contract level or at a more aggregated level."

20      28.      The 2008 and 2009 CMS bid instructions require that the profit margin submitted

21  in the bid filings for EGWP MA plans bid be within 1% of the overall margin level for the MAO's

22  individual/general enrollment plans (at the contract level or at more aggregated level) when such

23  EGWP bid is averaged with the profit margins submitted for all EGWP other bids or within 1% of

24  the margin submitted for the corresponding individual/general enrollment MA plan for the same

25  year.

26  **VII.   DEFENDANT VIOLATED THE FALSE CLAIMS ACT BY DELIBERATELY**
       **DISREGARDING CMS BID INSTRUCTIONS AND BY PROVIDING**
27     **INACCURATE AND FALSE DATA TO THE UNITED STATES IN ITS**
       **MEDICARE ADVANTAGE BIDS**
28

THIRD AMENDED COMPLAINT:                                    CASE NO. CV-09-5984 (JSW)

**A.  Kaiser's Profit Margin Projections and Actual Profit Margins**

29.      Kaiser annually projects profit margins for all of its lines of business by regions in which Kaiser has MA contracts (*i.e.*, California and Hawaii).

30.      Internal, non-public Kaiser data, in the possession of Relator, shows Kaiser's actual profit margins for Kaiser's EGWP MA plans in California.  The following table contains data of which Kaiser was aware at the time it made its profit margin projections for 2008 and 2009, and shows that Kaiser's actual profit margins for Kaiser's EGWP MA plans in California have been as follows:

**Table 1**

| Year | Kaiser Actual Profit Margin EGWP MA Plans—California | |
|------|-------------|-------------------|
| | **Total Profit** | **Net Profit Margin** |
| 2009 (through Q3) | $537,570,760 | 16.10% |
| 2008 | $624,695,424 | 14.67% |
| 2007 | $630,380,394 | 15.93% |
| 2006 | $520,534,001 | 14.55% |
| 2005 | $575,014,555 | 16.71% |
| 2004 | $523,483,821 | 17.44% |
| 2003 | $423,823,892 | 16.92% |

31.      Kaiser's actual profit margin on its Medicare Advantage business segment far exceeded the profit margins on its other lines of business.  From 2005 to 2007, Kaiser made 8% to 12% profit on its Medicare Advantage business.  On all lines of business, in contrast, Kaiser made a much smaller profit margin, typically in the 3 to 5% range annually.  Kaiser made an even smaller profit margin on its other lines of business (*i.e.*, non-MA lines), typically in the 2% to -1% range annually.  The following table contains data from 2003 to 2006 of which Kaiser was aware at the time it made its profit margin projections for 2008 and data from 2003 to 2007 of which Kaiser was aware at the time it made its profit margin projections for 2009, and contrasts Kaiser's

profit margins on its Medicare Advantage program with those of its other lines of business, and its overall profit margins:

**Table 2**

| Year | Region | Kaiser Actual Net Profit Margin for California Business | | | |
|------|--------|------------------------------------|------------------|--------------------|-----------------------------|
|      |        | Medicare Advantage Group Plans | Commercial HMO | All Lines of Business | Other Lines of Business (non-MA) |
| 2008 total | N. CA | 12.43% | 9.90% | 4.54% | 2.39% |
| 2008 total | S. CA | 17.39% | 4.65% | 4.29% | -1.09% |
| 2007 Q1 | N. CA | 12.96% | 8.94% | 5.51% | 3.13% |
| 2007 Q2 | N. CA | 14.49% | 9.41% | 5.71% | 2.22% |
| 2007 Q3 | N. CA | 16.22% | 9.67% | 5.78% | 2.38% |
| 2007 Q4 | N. CA | 8.83% | 5.00% | 0.46% | -0.75% |
| 2007 total | N. CA | 13.15% | 8.25% | 4.36% | 1.74% |
| 2007 Q1 | S. CA | 18.11% | 4.74% | 4.22% | -1.07% |
| 2007 Q2 | S. CA | 23.68% | 5.07% | 6.32% | -0.62% |
| 2007 Q3 | S. CA | 21.35% | 3.87% | 4.55% | -1.47% |
| 2007 Q4 | S. CA | 14.83% | 2.58% | 0.04% | -5.18% |
| 2007 total | S. CA | 19.50% | 4.06% | 3.78% | -2.10% |
| 2006 Q1 | N. CA | 16.26% | 6.74% | 5.27% | 1.27% |
| 2006 Q2 | N. CA | 14.55% | 4.68% | 2.88% | -1.47% |
| 2006 Q3 | N. CA | 12.35% | 2.98% | 1.41% | -2.75% |
| 2006 Q4 | N. CA | 5.93% | 5.68% | 0.35% | -0.85% |
| 2006 total | N. CA | 12.33% | 5.02% | 2.47% | -0.95% |
| 2006 Q1 | S. CA | 19.33% | 4.44% | 4.43% | -0.95% |
| 2006 Q2 | S. CA | 18.43% | 5.80% | 5.59% | 0.71% |
| 2006 Q3 | S. CA | 15.83% | 1.41% | 0.90% | -4.32% |
| 2006 Q4 | S. CA | 15.18% | 3.72% | 2.80% | -1.86% |
| 2006 total | S. CA | 17.18% | 3.84% | 3.42% | -1.61% |
| 2005 Q1 | N. CA | 16.30% | 7.62% | 7.62% | 2.67% |
| 2005 Q2 | N. CA | 13.99% | 7.95% | 7.95% | 3.32% |
| 2005 Q3 | N. CA | 11.05% | 4.80% | 1.72% | -0.84% |
| 2005 Q4 | N. CA | 7.47% | 3.65% | -0.55% | -2.11% |
| 2005 total | N. CA | 12.21% | 5.99% | 3.04% | 0.74% |
| 2005 Q1 | S. CA | 29.02% | 8.50% | 8.66% | 3.30% |
| 2005 Q2 | S. CA | 23.30% | 6.19% | 6.06% | 1.20% |
| 2005 Q3 | S. CA | 20.64% | 3.66% | 3.01% | -2.40% |
| 2005 Q4 | S. CA | 12.55% | 1.22% | -1.55% | -4.69% |
| 2005 total | S. CA | 21.48% | 4.87% | 4.02% | -0.68% |

The foregoing figures are taken from non-public, internal Kaiser documents in the possession of Relator.

32.     *2008 Projected Margin for Other Lines of Business*.  Kaiser projected that its profit margin in 2008 for other lines of business at the more aggregated level (*i.e.*, California and Hawaii, which are the only regions in which Kaiser has Medicare Advantage contracts) would be 0.80%.  Kaiser projected its profit margin in 2008 for other lines of business in California would be 0.90%.

33.     *2009 Projected Margin for Other Lines of Business*.  Kaiser projected that its profit margin in 2009 for other lines of business at the more aggregated level (*i.e.*, in California and Hawaii, which are the only regions in which Kaiser has Medicare Advantage contracts) would be 1.12%.  Kaiser projected its California profit margin in 2009 for other lines of business would be 1.25%.

## B.  **Kaiser's Bids for General Enrollment Plans**

34.     Between June 1, 2007 and August 2007, Kaiser submitted various versions of its general enrollment bids for 2008 to CMS.  Ultimately, on August 24, 2007 and August 31, 2007 (with respect to Contract/Plan Numbers H0524-002, H0524-003 and H0524-0015), Kaiser, by and through its certifying actuary, knowingly and falsely certified that the following general enrollment bids for 2008 complied with CMS bid instructions, and submitted such bids and certification to the Government:

**Table 3**

| Year: | Contract/Plan Number: | Submitted Profit Margin: |
|---|---|---|
| 2008: | H0524-002 | 3.7% |
| | H0524-008 | 0.0% |
| | H0524-013 | 8.9% |
| | H0524-031 | 2.5% |
| | H0524-032 | 8.7% |
| | H0524-003 | 4.3% |
| | H0524-010 | -9.1% |
| | H0524-015 | 9.0% |

35.      Between May 30, 2008 and August 2008, Kaiser submitted various versions of its general enrollment bids for 2009 to CMS.  Ultimately, on August 21, 2008, Kaiser, by and through its certifying actuary, knowingly and falsely certified that the following general enrollment bids for 2009 complied with CMS bid instructions, and submitted such bids and certification to the Government:

**Table 4**

| Year: | Contract/Plan Number: | Submitted Profit Margin: |
|-------|----------------------|--------------------------|
| 2009: | H0524-003 | 8.1% |
|       | H0524-008 | 0.7% |
|       | H0524-013 | 7.6% |
|       | H0524-031 | 1.4% |
|       | H0524-032 | 7.2% |
|       | H0524-010 | -3.1% |
|       | H0524-015 | 10.4% |
|       | H0524-034 | 9.5% |
|       | H0524-035 | 16.4% |
|       | H0524-002 | 8.4% |

36.      As described above, in 2008 and 2009, CMS bid instructions required that the profit margins submitted in an MAO's individual/general enrollment bids, when combined with the profit margin submitted in that MAO's other individual/general enrollment bids either at the contract level or at a more aggregated level to obtain a weighted average, be within a reasonable range (1.5%) of the MAO's other lines of business.

37.      Thus, as applied to Kaiser's individual/general enrollment bids for 2008 and 2009 identified above, CMS bid instructions required either (a) the profit margin submitted in each bid, when combined with the profit margins submitted in all other bids for Contract H0524 (California) to obtain a weighted average, to be within a reasonable range (1.5%) of the projected profit margin for Kaiser's other lines of business in California, or (b) the profit margin submitted in each bid, when combined with the profit margin submitted in Kaiser's bids for its other MA contract in Hawaii to obtain a weighted average, to be within a reasonable range (1.5%) of the projected profit

1  margin for Kaiser's other lines of business in California and Hawaii.

2      38.    *2008 Contract Level*.  The average of the profit margins submitted in Kaiser's

3  individual/general enrollment bids for Contract H0524 for 2008 was not within a reasonable range

4  (1.5%) of the projected profit margin for Kaiser's other lines of business in California.  The

5  average of the profit margins submitted in Kaiser's individual/general enrollment MA bids for

6  2008 for Contract H0524 was in excess of 2.40% (*i.e.*, Kaiser's projection of 0.90% for other lines

7  of business for California plus the 1.5% differential in CMS bid instructions) or, alternatively, was

8  in excess of 2.30% (*i.e.*, Kaiser's projection of 0.80% for other lines of business at the more

9  aggregated level plus the 1.5% differential in CMS bid instructions).  Instead, the average profit

10  margin for Kaiser's individual/general enrollment MA bids for 2008 for Contract H0524 was

11  5.25%.

12      39.    *2008 More Aggregated Level*.  The average of the profit margins submitted in

13  Kaiser's individual/general enrollment bids at the more aggregated level for 2008 was not within a

14  reasonable range (1.5%) of the projected profit margin for Kaiser's other lines of business at the

15  more aggregated level.  The average of the profit margins submitted in Kaiser's MA

16  individual/general enrollment bids for 2008 at the more aggregated level was in excess of 2.30%

17  (*i.e.*, Kaiser's projection of 0.80% for other lines of business at the more aggregated level plus the

18  1.5% differential in CMS bid instructions).  Instead, the average profit margin for Kaiser's

19  individual/general enrollment MA bids for 2008 at the more aggregated level was 5.29%.

20      40.    *2008 Affiliate Level*.  CMS bid instructions do not permit an MAO to aggregate its

21  bids with another MAO for purposes of determining whether individual/general enrollment bids

22  are within a reasonable range (1.5%) of the MAO's other lines of business.  Even if such an

23  aggregation were permissible, the average of the profit margins submitted in the individual/general

24  enrollment bids for Kaiser and all other MAOs affiliated with Kaiser for 2008 was not within a

25  reasonable range (1.5%) of the project profit margin for the other lines of business of Kaiser and

26  MAOs affiliated with Kaiser.  The projected profit margin in 2008 for the other lines of business

27  of Kaiser and MAOs affiliated with Kaiser would be 0.96%.  The average of the profit margins

28  submitted in the individual/general enrollment bids of Kaiser and all other MAOs affiliated with

Kaiser for 2008 at was in excess of 2.46% (*i.e.*, Kaiser's projection of 0.96% for other lines of business of Kaiser and MAOs affiliated with Kaiser plus the 1.5% differential in CMS bid instructions).  Instead, the average profit margin for the individual/general enrollment MA bids of Kaiser and all other MAOs affiliated with Kaiser for 2008 was 5.66%.

41.     *2009 Contract Level*.  The average of the profit margins submitted in Kaiser's individual/general enrollment bids for Contract H0524 for 2009 was not within a reasonable range (1.5%) of the projected profit margin for Kaiser's other lines of business in California.  The average of the profit margins submitted in Kaiser's individual/general enrollment MA bids for 2009 for Contract H0524 was in excess of 2.75% (*i.e.*, Kaiser's projection of 1.25% for other lines of business for California plus the 1.5% differential in CMS bid instructions) or, alternatively, was in excess of 2.62% (*i.e.*, Kaiser's projection of 1.12% for other lines of business at the more aggregated level plus the 1.5% differential in CMS bid instructions).  Instead, the average profit margin for Kaiser's individual/general enrollment MA bids for 2009 for Contract H0524 was 7.07%.

42.     *2009 More Aggregated Level*.  The average of the profit margins submitted in Kaiser's individual/general enrollment bids at the more aggregated level for 2009 was not within a reasonable range (1.5%) of the projected profit margin for Kaiser's other lines of business at the more aggregated level.  The average of the profit margins submitted in Kaiser's individual/general enrollment MA bids for 2009 at the more aggregated level was in excess of 2.62% (*i.e.*, Kaiser's projection of 1.12% for other lines of business at the more aggregated level plus the 1.5% differential in CMS bid instructions).  Instead, the average profit margin for Kaiser's individual/general enrollment MA bids for 2008 at the more aggregated level was 7.13%.

43.     *2009 Affiliate Level*.  CMS bid instructions do not permit an MAO to aggregate its bids with another MAO for purposes of determining whether individual/general enrollment bids are within a reasonable range (1.5%) of the MAO's other lines of business.  Even if such an aggregation were permissible, the average of the profit margins submitted in the individual/general enrollment bids for Kaiser and all other MAOs affiliated with Kaiser for 2009 was not within a reasonable range (1.5%) of the project profit margin for the other lines of business of Kaiser and

MAOs affiliated with Kaiser.  The projected profit margin in 2009 for the other lines of business of Kaiser and MAOs affiliated with Kaiser would be 1.17%.  The average of the profit margins submitted in the individual/general enrollment bids of Kaiser and all other MAOs affiliated with Kaiser for 2009 at was in excess of 2.67% (*i.e.*, Kaiser's projection of 1.17% for other lines of business of Kaiser and MAOs affiliated with Kaiser plus the 1.5% differential in CMS bid instructions).  Instead, the average profit margin for the individual/general enrollment MA bids of Kaiser and all other MAOs affiliated with Kaiser for 2009 was 6.48%.

44.     Kaiser's knowingly false certifications that the individual/general enrollment bids identified above complied with CMS bid instructions were material to the Government's decision to accept the these bids, to allow Kaiser to participate in the Medicare Advantage program and to pay money to Kaiser.

45.     Based on those false certifications, Kaiser received payments from the Government.  Kaiser's false statement that its bids complied with CMS bid instructions was integral to a causal chain leading to Kaiser's receipt of payments from the Government under the MA program.  Kaiser used its bids (and the resulting approval to offer its MA plans) when it submitted applications for payment under the MA program.  Therefore, the submission of the false cerfications of the bids, coupled with the applications for payment, constitute false claims under the False Claims Act.

**C.  Kaiser's Bids for EGWP Plans**

46.     Between June 1, 2007 and August 2007, Kaiser submitted various versions of its EGWP bids for 2008 to CMS.  Ultimately, on August 24, 2007, Kaiser, by and through its certifying actuary,  knowingly and falsely certified that the following EGWP bids for 2008 complied with CMS bid instructions and submitted such bids and certification to the Government:

**Table 5**

| Year: | ACR/Bid Number: | Submitted Profit Margin: |
|---|---|---|
| 2008: | H0524-801 | 7.6% |
|  | H0524-802 | 4.0% |

THIRD AMENDED COMPLAINT:                                    CASE NO. CV-09-5984 (JSW)

| Year: | ACR/Bid Number: | Submitted Profit Margin: |
|-------|-----------------|--------------------------|
|       | H0524-803       | 3.7%                     |
|       | H0524-804       | -11.4%                   |
|       | H0524-805       | 7.7%                     |
|       | H0524-806       | 4.0%                     |
|       | H0524-807       | 4.3%                     |
|       | H0524-808       | -11.6%                   |

47.     Between May 30, 2008 and August 2008, Kaiser submitted various versions of its EGWP bids for 2009 to CMS.  Ultimately, on August 21, 2008, Kaiser, by and through its certifying actuary, knowingly and falsely certified that the following EGWP bids for 2009 complied with CMS bid instructions and submitted such bids and certification to the Government:

**Table 6**

| Year: | ACR/Bid Number: | Submitted Profit Margin: |
|-------|-----------------|--------------------------|
| 2009: | H0524-805       | 11.4%                    |
|       | H0524-806       | 5.6%                     |
|       | H0524-807       | 6.0%                     |
|       | H0524-801       | 19.1%                    |
|       | H0524-802       | 0.6%                     |
|       | H0524-803       | -42.0%                   |
|       | H0524-804       | -51.5%                   |
|       | H0524-808       | 7,2%                     |
|       | H0524-809       | 11.7%                    |
|       | H0524-810       | 3.7%                     |
|       | H0524-811       | -0.1%                    |
|       | H0524-812       | 0.0%                     |

48.     As described above, in 2008 and 2009, CMS bid instructions required that the profit margin in each EGWP bid to be (a) within 1% of the overall margin level for the MAO's individual/general enrollment plans at the contract level when such EGWP bid is averaged with

THIRD AMENDED COMPLAINT:                          CASE NO. CV-09-5984 (JSW)

the profit margins submitted for all EGWP other bids for that contract, (b) within 1% of the overall margin level for all of the MAO's individual/general enrollment plans when such EGWP bid is averaged with the profit margins submitted for all EGWP other bids at the more aggregated level or (c) within 1% of the margin submitted for the corresponding individual/general enrollment MA plan for the same year.

49.      Thus, as applied to Kaiser's EGWP bids in 2008 and 2009 identified above, CMS bid instructions required either (a) the profit margin submitted in each EGWP bid, when combined with the profit margins submitted in all other EGWP bids for Contract H0524 (California) to obtain a weighted average, to be within 2.5% of the projected profit margin for Kaiser's other lines of business in California, or (b) the profit margin submitted in each EGWP bid, when combined with the profit margin submitted in all of Kaiser's EGWP bids for all other MA contracts to obtain a weighted average, to be within 2.5% of the projected profit margin for Kaiser's other lines of business at the more aggregated level, or (c) the profit margin submitted in each EGWP bid, if such bid is for an EGWP plan that has a has a corresponding individual/general enrollment MA plan for the same year, to be within 1% of such corresponding individual/general enrollment MA plan for the same year.

50.      Under CMS bid instructions, EGWP bids cannot satisfy the 1% differential requirement by comparison to the overall margin level of individual/general enrollment bids (at the contract level or the more aggregated level) if the individual/general enrollment bid margins violate the 1.5% differential requirement.

51.      As alleged above, the margins for Kaiser's individual/general enrollment MA plans were not properly submitted in accordance with CMS Bid Instructions. Kaiser's margins for its individual/general enrollment MA plans in California (Contract H0524) were well in excess of the 1.5% of Kaiser's projected margin for its other lines of business.

52.      *2008 Contract Level*.  At the contract level, as described above, Kaiser's average margin for its individual/general enrollment bids under Contract H0524 in 2008, to comply with CMS bid instructions, should have been no more than 2.40% (*i.e.*, Kaiser's projection of 0.90% for other lines of business for California plus the 1.5% differential in CMS bid instructions) or,

1    alternatively, no more than 2.30% (*i.e.*, Kaiser's projection of 0.80% for other lines of business at

2    the more aggregated level plus the 1.5% differential in CMS bid instructions).  Accordingly,

3    Kaiser's average margin for its EGWP bids under Contract H0524 in 2008, to comply with CMS

4    bid instructions, should have been no more than 3.40% (*i.e.*, the maximum individual/general

5    enrollment margin for California plus 1%) or, alternatively, no more than 3.30% (*i.e.*, the

6    maximum individual/general enrollment margin at the more aggregated level plus 1%).  Instead,

7    Kaiser's average margin for its EGWP bids under Contract H0524 in 2008 was 5.68%.

8        53.    *2008 More Aggregated Level*.  At the more aggregated level, as described above,

9    Kaiser's average margin for its individual/general enrollment bids in 2008, to comply with CMS

10   bid instructions, should have been no more than 2.30% (*i.e.*, Kaiser's projection of 0.80% for other

11   lines of business at the more aggregated level plus the 1.5% differential in CMS bid instructions).

12   Accordingly, Kaiser's average margin for its EGWP bids at the more aggregated level in 2008, to

13   comply with CMS bid instructions, should have been no more than 3.30% (*i.e.*, the maximum

14   individual/general enrollment margin at the more aggregated level plus 1%).  Instead, Kaiser's

15   average margin for its EGWP bids at the more aggregated level in 2008 was 5.76%.

16       54.    *2008 Affiliate Level*.  CMS bid instructions do not permit an MAO to aggregate its

17   bids with another MAO for purposes of determining whether EGWP bids are within 2.5% of the

18   projected profit margin for Kaiser's other lines of business.  Even if such an aggregation were

19   permissible, the average of the profit margins submitted in the EGWP bids for Kaiser and all other

20   MAOs affiliated with Kaiser for 2008 was not within 2.5% of the project profit margin for the

21   other lines of business of Kaiser and MAOs affiliated with Kaiser.  The projected profit margin in

22   2008 for the other lines of business of Kaiser and MAOs affiliated with Kaiser would be 0.96%.

23   As described above, the average margin for its individual/general enrollment bids of Kaiser and

24   MAOs affiliated with Kaiser in 2008, to comply with CMS bid instructions, should have been no

25   more than 2.46% (*i.e.*, the projection of 0.96% for other lines of business of Kaiser and MAOs

26   affiliated with Kaiser plus the 1.5% differential in CMS bid instructions).  Accordingly, the

27   average margin for EGWP bids of Kaiser and MAOs affiliated with Kaiser in 2008, to comply

28   with CMS bid instructions, should have been no more than 3.46% (*i.e.*, the maximum

individual/general enrollment margin plus 1%).  Instead, the average margin for EGWP bids of Kaiser and MAOs affiliated with Kaiser in 2008 was 5.95%.

55.     *2009 Contract Level*.  At the contract level, as described above, Kaiser's average margin for its individual/general enrollment bids under Contract H0524 in 2009, to comply with CMS bid instructions, should have been no more than 2.75% (*i.e.*, Kaiser's projection of 1.25% for other lines of business for California plus the 1.5% differential in CMS bid instructions) or, alternatively, no more than 2.62% (*i.e.*, Kaiser's projection of 1.12% for other lines of business at the more aggregated level plus the 1.5% differential in CMS bid instructions).  Accordingly, Kaiser's average margin for its EGWP bids under Contract H0524 in 2009, to comply with CMS bid instructions, should have been no more than 3.75% (*i.e.*, the maximum individual/general enrollment margin for California plus 1%) or, alternatively, no more than 3.62% (*i.e.*, the proper individual/general enrollment margin at the more aggregated level plus 1%).  Instead, Kaiser's average margin for its EGWP bids under Contract H0524 in 2009 was 8.13%.

56.     *2009 More Aggregated Level*.  At the more aggregated level, as described above, Kaiser's average margin for its individual/general enrollment bids in 2009, to comply with CMS bid instructions, should have been no more than 2.62% (*i.e.*, Kaiser's projection of 1.12% for other lines of business at the more aggregated level plus the 1.5% differential in CMS bid instructions).  Accordingly, Kaiser's average margin for its EGWP bids at the more aggregated level in 2009, to comply with CMS bid instructions, should have been no more than 3.62% (*i.e.*, the proper individual/general enrollment margin at the more aggregated level plus 1%).  Instead, Kaiser's average margin for its EGWP bids at the more aggregated level in 2009 was 8.22%.

57.     *2009 Affiliate Level*.  CMS bid instructions do not permit an MAO to aggregate its bids with another MAO for purposes of determining whether EGWP bids are within 2.5% of the projected profit margin for Kaiser's other lines of business.  Even if such an aggregation were permissible, the average of the profit margins submitted in the EGWP bids for Kaiser and all other MAOs affiliated with Kaiser for 2009 was not within 2.5% of the project profit margin for the other lines of business of Kaiser and MAOs affiliated with Kaiser.  The projected profit margin in 2009 for the other lines of business of Kaiser and MAOs affiliated with Kaiser would be 1.17%.

As described above, the average margin for its individual/general enrollment bids of Kaiser and MAOs affiliated with Kaiser in 2009, to comply with CMS bid instructions, should have been no more than 2.67% (*i.e.*, the projection of 1.17% for other lines of business of Kaiser and MAOs affiliated with Kaiser plus the 1.5% differential in CMS bid instructions).  Accordingly, the average margin for EGWP bids of Kaiser and MAOs affiliated with Kaiser in 2009, to comply with CMS bid instructions, should have been no more than 3.67% (*i.e.*, the maximum individual/general enrollment margin plus 1%).  Instead, the average margin for EGWP bids of Kaiser and MAOs affiliated with Kaiser in 2009 was 7.85%.

58.    *2008 Corresponding Plan*.  Moreover, contrary to its certifications of compliance with CMS bid instructions, Kaiser submitted profit margins in its bids for Plans H0524-805 and H0524-806 for 2008 and 2009 that were not within 1% of the margins submitted in the bids for Kaiser's comparable and corresponding individual/general enrollment MA plans for Southern California and Northern California, respectively—specifically, (1) Kaiser submitted the 2008 bid for Plan H0524-805 with a profit margin of 7.7% even though Kaiser had submitted a profit margin of 4.3% for the comparable and corresponding individual/ general enrollment MA plan (Plan H0524-003); (2) Kaiser submitted the 2008 bid for Plan H0524-806 with a profit margin of 4.0% even though Kaiser had submitted a profit margin of 0.0% for the comparable and corresponding individual/general enrollment MA plan (Plan H0524-008); (3) Kaiser submitted the 2009 bid for Plan H0524-805 with a profit margin of 11.4% even though Kaiser had submitted a profit margin of 8.0% for the comparable and corresponding individual/general enrollment MA plan (Plan H0524-003); and (4) Kaiser submitted the 2009 bid for Plan H0524-806 with a profit margin of 5.6% even though Kaiser had submitted a profit margin of 0.7% for the comparable and corresponding individual/general enrollment MA plan (Plan H0524-008).  Plan H0524-003 was the comparable and corresponding individual/general enrollment plan to Plan H0524-805 (EGWP plan) because each covered a similar geographic region (*i.e.*, the Southern California region) and each had significant projected enrollment.  Plan H0524-008 was the comparable and corresponding individual/general enrollment plan to Plan H0524-806 (EGWP plan) because each covered a similar geographic region (*i.e.*, the Northern California region) and each had significant

1    projected enrollment.

2        59.    Kaiser's knowingly false certifications that the EGWP bids identified above

3    complied with CMS bid instructions were material to the Government's decision to accept the

4    these bids, to allow Kaiser to participate in the Medicare Advantage program and to pay money to

5    Kaiser.

6        60.    Based on those false certifications, Kaiser received payments from the

7    Government. Kaiser's false statement that its bids complied with CMS bid instructions was

8    integral to a causal chain leading to Kaiser's receipt of payments from the Government under the

9    MA program.  Kaiser used its bids (and the resulting approval to offer its MA plans) when it

10   submits an application for payment under the MA program.  Therefore, the submission of the false

11   certifications of the bids, coupled with the applications for payment, constitute false claims under

12   the False Claims Act.

13       **D.  Kaiser Acted Knowingly in Falsely Certifying its Bids**

14       61.    At all times relevant hereto, Defendant "knew" or acted "knowingly," in making,

15   presenting, or submitting false statements and certifications in its bids and false claims.  In that

16   respect, Defendant acted:

17                a)    With actual knowledge of the information; or

18                b)    In deliberate ignorance of the truth or falsity of the information; or

19                c)    With reckless disregard of the truth or falsity of the information.

20       62.    With respect to Defendant's conduct occurring prior to the effective date of the

21   amendments contained in Pub. L. 111-21, May 20, 2009, 123 Stat. 1625, Defendant presented

22   false claims, as defined in 31 U.S.C. § 3729(a) (2008), by:

23                a.    Knowingly presenting, or causing to be presented, false or fraudulent claims for

24                      payment or approval;

25                b.    Knowingly making, using, or causing to be made or used, a false record or

26                      statement to get a false or fraudulent claim paid or approved by the

27                      Government; and

28                c.    Knowingly making, using, or causing to be made or used, a false record or

THIRD AMENDED COMPLAINT:                                CASE NO. CV-09-5984 (JSW)

1    statement to conceal, avoid, or decrease an obligation to pay or transmit money

2    or property to the Government.

3    63.    With respect to Defendant's conduct occurring after the effective date of the

4    amendments contained in Pub. L. 111-21, May 20, 2009, 123 Stat. 1625, Defendant presented

5    false claims, as defined in 31 U.S.C. § 3729(a)(1) (2009), by:

6    a.    Knowingly presenting, or causing to be presented, false or fraudulent claims for

7    payment or approval;

8    b.    Knowingly making, using, or causing to be made or used, a false record or

9    statement material to a false or fraudulent claim; and

10    c.    Knowingly making, using, or causing to be made or used, a false record or

11    statement material to an obligation to pay or transmit money or property to the

12    Government, or knowingly concealing or knowingly and improperly avoiding

13    or decreasing an obligation to pay or transmit money or property to the

14    Government.

15    64.    As a result of the foregoing, Kaiser's bids identified above, and each claim for

16    payment submitted on the basis of those filings, was a false claim in violation of the False Claims

17    Act (31 U.S.C. § 3729 *et seq.*).  The United States paid Kaiser monies based on those false claims.

18    Additionally, as a result of the foregoing, Defendant received overpayments, which it had an

19    obligation to return to the Government, and failed to do so in violation of the False Claims Act.

20    65.    Internal, non-public Kaiser data in the possession of the Relator establishes that

21    Kaiser has violated the False Claims Act as described in this Complaint.

22    66.    The United States has been damaged by Defendant's false claims in an amount that

23    is presently unknown, but believed to be in the billions of dollars.

24

25    **FIRST CAUSE OF ACTION**

26    (Violation of the False Claims Act by Presenting False Claims—15 U.S.C. § 3729(a)(1) (2008)

27    and 15 U.S.C. § 3729(a)(1)(A) (2009))

28    67.    Plaintiff incorporates herein by reference and realleges the allegations stated in

21

1 | Paragraphs 1 through 62, inclusive, of this Complaint.

2 |     68.     With respect to Defendant's conduct occurring prior to the effective date of the

3 | amendments contained in Pub. L. 111-21, May 20, 2009, 123 Stat. 1625, Defendant knowingly (as

4 | defined in 31 U.S.C. § 3729(b) (2008)) presented or caused to be presented false claims for

5 | payment or approval.  With respect to Defendant's conduct occurring after the effective date of the

6 | amendments contained in Pub. L. 111-21, May 20, 2009, 123 Stat. 1625, Defendant knowingly (as

7 | defined in 31 U.S.C. § 3729(b)(1) (2009)) presented or caused to be presented false claims for

8 | payment or approval to an officer or employee of the United States.

9 |     69.     Defendant knowingly presented false records and statements, including but not

10 | limited to bid filings and requests for reimbursement, in order to obtain payment under the

11 | Medicare Advantage program.  Among other things, Defendant submitted bid filings that falsely

12 | certified compliance with CMS bid instructions.

13 |     70.     Defendant knowingly made, used, and caused to be made and used false

14 | certifications that its claims, and all documents and data upon which those claims were based,

15 | were accurate, and were supplied in full compliance with all applicable statues, regulations and

16 | CMS bid instructions. Those certifications were material to the Government's payment of the

17 | claims.

18 |     71.     The conduct of Defendant violated 31 U.S.C. § 3729(a)(1) (2008) and/or 31 U.S.C.

19 | § 3729(a)(1)(A) (2009) and was a substantial factor in causing the United States to sustain

20 | damages in an amount according to proof.

21 | **SECOND CAUSE OF ACTION**

22 | (Violation of the False Claims Act by Making or Using False Records or Statements

23 | Material to Payment or Approval of False Claims—15 U.S.C. § 3729(a)(2) (2008) and 15 U.S.C. §

24 | 3729(a)(1)(B) (2009))

25 |     72.     Plaintiff incorporates herein by reference and realleges the allegations stated in

26 | Paragraphs 1 through 62, inclusive, of this Complaint.

27 |     73.     With respect to Defendant's conduct occurring prior to the effective date of the

28 | amendments in Pub. L. 111-21, May 20, 2009, 123 Stat. 1625, Defendant knowingly (as defined

in 31 U.S.C. § 3729(b) (2008)) made, used, or caused to be made or used, false records or statements to get to false or fraudulent claims paid and/or approved by the Government.  With respect to Defendant's conduct occurring after the effective date of the amendments in Pub. L. 111-21, May 20, 2009, 123 Stat. 1625, Defendant knowingly (as defined in 31 U.S.C. § 3729(b)(1) (2009)) made, used, or caused to be made or used false records or statements material to false or fraudulent claims.

74.      Defendant knowingly made, used, and/or caused to be made and used false records and statements, including but not limited to bid filings and requests for reimbursement, to obtain (or that were material to obtaining) payment under the Medicare Advantage program.  Among other things, Defendant made and used bid filings that falsely certified compliance with CMS bid instructions.

75.      Defendant knowingly made, used, and caused to be made and used false certifications that its claims, and all documents and data upon which those claims were based, were accurate, and were supplied in full compliance with all applicable statutes, regulations and CMS bid instructions. Those certifications were material to the Government's payment of the claims..

76.      The conduct of Defendant violated 31 U.S.C. § 3729(a)(2) (2008) and/or 31 U.S.C. § 3729(a)(1)(B) (2009) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

**THIRD CAUSE OF ACTION**

(In the Alternative)

(Violation of the False Claims Act by Retention of Proceeds to Which Not

Entitled—31 U.S.C. § 3729(a)(7) (2008) and/or 31 U.S.C. § 3729(a)(1)(G) (2009))

77.      Plaintiff incorporates herein by reference and realleges the allegations stated in Paragraphs 1 through 62, inclusive, of this Complaint.

78.      In the alternative, with respect to Defendant's conduct occurring prior to the effective date of the amendments in Pub. L. 111-21, May 20, 2009, 123 Stat. 1625, Defendant knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid

1    or decrease an obligation to pay or transmit money or property to the Government and, with

2    respect to Defendant's conduct occurring after the effective date of the amendments in Pub. L.

3    111-21, May 20, 2009, 123 Stat. 1625, Defendant knowingly made, used, or caused to be made or

4    used, a false record or statement material to an obligation to pay or transmit money or property to

5    the Government, or knowingly concealed or knowingly and improperly avoided or decreased an

6    obligation to pay or transmit money or property to the Government.

7    79.    As discussed above, Defendant received far more money from the Medicare

8    Advantage program than it was entitled to.  Defendant knew that it had received more money that

9    it was entitled to, and avoided its obligation to return the excess money to the Government.

10   80.    The conduct of Defendant violated 31 U.S.C. § 3729(a)(7) (2008) and/or 31 U.S.C.

11   § 3729(a)(1)(G) (2009) and was a substantial factor in causing the United States to sustain

12   damages in an amount according to proof.

13                                   **PRAYER FOR RELIEF**

14   WHEREFORE, Plaintiff by and through Relator, prays judgment in its favor and against

15   Defendant as follows:

16   1.    That judgment be entered in favor of plaintiff UNITED STATES OF AMERICA

17   *ex rel*. CHRIS McGOWAN, and against Defendant KAISER FOUNDATION HEALTH PLAN,

18   INC. for the amount of damages to United States arising from Defendant's inflated ACR and bid

19   filings:

20          a.    On the First Cause of Action (Presenting False Claims (15 U.S.C. § 3729(a)(1)

21                (2008) and/or 31 U.S.C. § 3729(a)(1)(A) (2009))) damages as provided by 31

22                U.S.C. § 3729(a) (2008) and/or 31 U.S.C. § 3729(a)(1) (2009), in the amount of:

23                i.    Triple the amount of damages sustained by the Government;

24                ii.   Civil penalties of Ten Thousand Dollars ($10,000.00) for each false claim;

25                iii.  Recovery of costs, attorneys' fees, and expenses;

26                iv.   Pre- and post-judgment interest;

27                v.    Such other and further relief as the Court deems just and proper;

28          b.    On the Second Cause of Action (False Claims Act; Making or Using False Records

or Statements Material to Payment or Approval of False Claims (31 U.S.C. § 3729(a)(2) (2008) and/or 31 U.S.C. § 3279(a)(1)(B) (2009))) damages as provided by 31 U.S.C. § 3729(a) (2008) and/or 31 U.S.C. § 3729(a)(1) (2009) in the amount of:

  i.   Triple the amount of damages sustained by the Government;

  ii.   Civil penalties of Ten Thousand Dollars ($10,000.00) for each false claim;

  iii.   Recovery of costs, attorneys' fees and expenses;

  iv.   Pre- and post-judgment interest;

  v.   Such other and further relief as the Court deems just and proper; and

c.   On the Third Cause of Action (False Claims Act, Retention of Proceeds to Which Not Entitled (31 U.S.C. § 3729(a)(7) (2008) and/or 31 U.S.C.§ 3729(a)(1)(G) (2009))) damages as provided by 31 U.S.C. § 3729(a) (2008) and/or 31 U.S.C. § 3729(a)(1) (2009) in the amount of:

  i.   Triple the amount of damages sustained by the Government;

  ii.   Civil penalties of Ten Thousand Dollars ($10,000.00) for each false claim;

  iii.   Recovery of costs; attorneys' fees, and expenses;

  iv.   Pre- and post-judgment interest;

  v.   Such other and further relief as the Court deems just and proper.

2.   Further, Relator, on his own behalf, requests that he receive such maximum amount as permitted by law, of the proceeds of this action or settlement of this action collected by the United States, plus an amount for reasonable expense incurred, plus reasonable attorneys' fees and costs of this action.  Relator requests that the percentage be based upon the total value recovered, including any amounts received from individuals or entities not parties to this action.

Dated: _____, 2013

WILLIAM D. BEIL
JASON M. HANS
ROUSE HENDRICKS GERMAN MAY PC

JEFFREY E. FAUCETTE
SKAGGS FAUCETTE LLP


By:  _____
                Jason M. Hans
Attorneys for Relator CHRIS McGOWAN

THIRD AMENDED COMPLAINT:                                   CASE NO. CV-09-5984 (JSW)

1

**JURY TRIAL DEMANDED**

2          Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands trial by

3     jury of all issues properly triable of right by a jury.

4

5     Dated: __, 2013                            WILLIAM D. BEIL
                    July 19                       JASON M. HANS
6                                                 ROUSE HENDRICKS GERMAN MAY PC

7                                                 JEFFREY E. FAUCETTE
8                                                 SKAGGS FAUCETTE LLP

9
                                                        /s/ Jason M. Hans
10                                                By: _____
11                                                         Jason M. Hans
                                                  Attorneys for Relator CHRIS McGOWAN
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THIRD AMENDED COMPLAINT:                                    CASE NO. CV-09-5984 (JSW)